# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00282-CV

**Danny Lee Kennell, Appellant**

**v.**

**Stephanie Monique Rogers, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
## NO. 226,203-E, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Danny Lee Kennell challenges a protective order entered against him pursuant to Title IV of the Texas Family Code. *See* Tex. Fam. Code Ann. §§ 71.001-87.004 (West 2002 & Supp. 2008). In two issues, Kennell contends that the evidence was factually insufficient to support the trial court's findings that domestic violence had occurred and was likely to reoccur and the granting of a protective order. For the reasons that follow, we affirm the order of the trial court.

## BACKGROUND

Shortly after her divorce in 2006, Stephanie Monique Rogers and Kennell began dating. Rogers, an army lieutenant on active duty at Fort Hood, acquired a house in Killeen and lived with Kennell and the child born of their relationship. As their relationship deteriorated, Rogers became fearful of Kennell and, in October 2007, she sought a protective order prohibiting Kennell

from committing family violence against or otherwise communicating with or contacting her and the child except as provided in the order.

In November 2007, the trial court conducted a hearing on Rogers's application for a protective order. Rogers testified in support of her application for a protective order. In addition, several friends and co-workers testified to their observations concerning the relationship between Rogers and Kennell.

At the hearing, Rogers testified to acts of violence committed by Kennell. In December 2006, Rogers and Kennell traveled with their baby to Kennell's mother's house in Louisiana. Rogers testified that Kennell accused her of cheating on him and locked her out of the house. As she beat on the door to get inside where Kennell was with the baby, Kennell came outside and hit her twice in the face. Rogers testified that she fell to the ground: "When I tried to get up again, he hit me. He went inside. Once he came out, he came out with the baby." Rogers claimed that Kennell choked her and then drove off in the car with the baby. Because Kennell had left Rogers in Louisiana on a prior occasion and she had had to find a way to get back to Killeen, she called her parents who lived nearby in Baton Rouge. After giving a statement to the police, Rogers drove to Baton Rouge with her parents. No charges were filed against Kennell.

In his testimony, Kennell acknowledged that he locked Rogers out of the house and left with their child, but denied that he made physical contact with her. He testified, "To my knowledge, I didn't do anything because she called the police and the police didn't arrest me nor did the police come after me or serve me papers." Kennell acknowledged that "[w]hat I think I did at that time was, took my son from the home and I gave her the keys to the rent-a-car and I took the son from my mother['s] home and we left." A Fort Hood co-worker of Rogers testified that Rogers was

2

distressed and upset about the incident; Rogers advised the co-worker that Kennell hit her "and there were police involved." Rogers and Kennell reconciled when they returned to Fort Hood.

In September 2007, Rogers testified that she was giving the baby a bath when Kennell entered the bathroom. An altercation occurred when the baby threw up on Kennell and he attempted to force himself close to Rogers and wipe it on Rogers. When Kennell slammed the bathroom door closed and Rogers attempted to push him "out of my way," Kennell grabbed her arm and pushed her against a towel rack, bruising her on her back and arm. He then left the bathroom and began watching television in the living room "as though nothing happened." Rogers was bruised and had a mark on her back and a purple bruise on her left arm. The co-worker testified that she observed the bruises on Rogers's back and arm the morning after the incident occurred and told Rogers that she needed to get out of the relationship. Photographs showing the bruises were introduced into evidence. Kennell denied that he touched Rogers and did not know how she got the marks.

Soon thereafter, Rogers learned that a gun she kept for her safety was missing. She testified that she was fearful for her life and went to a friend's house to call police. Although she told Kennell she was going to a friend's house, she was trying to leave him and take the child. Rogers testified that, because the child was sleeping, Kennell "told me he didn't see a need for me to take him with me." Although the police arrived and searched the house for the gun, they were unable to find it. The police assisted Rogers retrieving some things from her house. Claiming he later found the gun, Kennell returned the gun to Rogers two days later. Rogers testified that Kennell told her that "[t]he reason why he took the weapon is because he felt that the situation was getting worse and he was going to take my weapon and sell it and use the money." Kennell testified that he did not think the weapon was ever missing and that he found the firearm underneath the bed and

3

returned it to Rogers. Kennell testified that he was not aware the police ever searched the house for the weapon. He explained that he got the gun and gave it to Rogers "[b]ecause she was making a big deal of it. And I just wanted to show her that I'm not a threat to her. I don't need her gun."

Rogers testified that she feared for her life when she was around Kennell and that she feared that the violence would continue. Other witnesses testified that Rogers was scared and fearful of Kennell and "not herself." Another co-worker testified that he received a threatening text message from Kennell. When he accompanied Rogers to her house to retrieve some of her things, on one occasion the locks were changed and, on another occasion, Rogers was unable to get into the house because the doors were blocked with a washing machine, a love seat, and a sofa. The co-worker testified that when Rogers and the co-worker were eventually able to enter, Kennell "was standing there with the recording camera recording the whole thing." Two co-workers also testified to an altercation that occurred when Kennell tried to leave a scheduled visitation with the child at a McDonald's restaurant. Although Kennell was permitted visitation, he was not permitted to leave with the child. When he tried to do so, an altercation ensued and the police were called. During another incident, Rogers called a co-worker for help when Kennell burst into her house, and she was very nervous.

Kennell testified, denying that he ever physically harmed Rogers. He also testified that he continued to have contact with Rogers and that their interactions were amicable. Two neighbors also testified on his behalf that they had never observed Kennell engage in any kind of violence.

4

At the conclusion of the hearing, the trial court found that Kennell had committed family violence and that family violence was likely to occur again in the future. The trial court made the following findings:

2.    In September 2007 while the parties were living in the home of the Applicant, Stephanie Monique Rogers, . . . the Respondent, Danny Lee Kennell, grabbed Applicant by her arm in the presence of their child and pushed Applicant up against the wall causing her to be afraid for her life.

3.    As a result of the incident in September 2007, Applicant suffered a mark on her back, bruises on her left arm and two marks on the left part of her back.

4.    In December 2006 Respondent locked the Applicant outside his parent's home in Louisiana, hit her in the face two times, choked her and took the child and left the residence.

* * *

8.    Respondent owns a 99 mm handgun with ammunition and had possession of them at the . . . residence.

9.    In October 2007, Applicant's handgun was missing from the residence and Respondent returned it to her several days later claiming that he had found it.

* * *

14.   Respondent has communicated with Applicant's chain of command unnecessarily and with the intent to harass the Applicant.

The trial court concluded that Kennell had committed family violence and that Kennell was likely to commit family violence in the future. The trial court made the following conclusions of law:

1.    Respondent has committed family violence against the Applicant in the immediate presence of the child the subject of this suit.

5

2.      The Respondent is likely to commit family violence on the Applicant in the future.

3.      A protective order is necessary to prohibit the Respondent's commission of family violence against the Applicant.

Following entry of a final order in the suit affecting parent-child relationship, Kennell appealed the entry of the protective order.

## DISCUSSION

When the trial court acts as a fact finder, we may review its findings under the legal and factual sufficiency standards. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *B.C. v. Rhodes*, 116 S.W.3d 878, 883-84 (Tex. App.—Austin 2003, no pet.). In conducting a factual sufficiency review, we examine the entire record and consider and weigh all the evidence, both in support of, and contrary to, the challenged finding. *Golden Eagle Archery v. Jackson*, 116 S.W.3d 757, 761-62 (Tex. 2003); *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must uphold the finding unless the evidence that supports it is so weak as to render the finding clearly wrong or manifestly unjust or the evidence to the contrary is so overwhelming that the finding ought to be set aside and a new trial ordered. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 823 (Tex. App.—Fort Worth 2007, no pet.). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We will not substitute our judgment for

6

that of the trial court merely because we might reach a different conclusion. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

A trial court shall render a protective order if, after a hearing, it finds that family violence has occurred and is likely to occur in the future. Tex. Fam. Code Ann. §§ 81.001, 85.001 (West 2002). "Family violence," as used in the trial court's findings, includes "dating violence." *See id*. § 71.004(3) (West 2002). The family code defines dating violence as follows:

> "Dating violence" means an act by an individual that is against another individual with whom that person has or has had a dating relationship that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the individual in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

*Id*. § 71.0021(a) (West 2002).

In his first issue, Kennell contends that the evidence is factually insufficient to show that he committed dating violence against Rogers in the past. Because Kennell (i) denied at the hearing that any acts of violence occurred, and (ii) introduced evidence that he and Rogers continued to have contact in person and by telephone, e-mail, and text messaging, Kennell contends that the evidence is insufficient for the trial court to find that domestic violence occurred.

Based on this record, we hold that the evidence was factually sufficient to support the trial court's granting of the protective order. The trial court, as fact finder, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *GTE Mobilnet*, 61 S.W.3d at 615-16. The trial court was entitled to believe Rogers's testimony describing the physical harm caused by Kennell as well as his threatening behavior and to disbelieve Kennell's testimony denying

7

ever striking her. It was for the trial court alone to determine the credibility of the witnesses, and the trial court could have disregarded Kennell's denials in their entirety. *See Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580-81 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). The evidence supporting the trial court's finding that Kennell had committed dating violence is not so weak as to render the finding clearly wrong or manifestly unjust. The trial court's finding on this issue is supported by factually sufficient evidence. We overrule Kennell's first issue.

In his second issue, Kennell contends that there is factually insufficient evidence to show that he was likely to commit acts of dating violence in the future. We disagree.

Kennell does not address this issue separately from his first issue, nor does he address the likelihood of committing future acts of violence. Rogers testified that she was in fear of Kennell and that she believed that the violence was likely to continue unless the judge granted a protective order. The evidence supporting the trial court's finding that Kennell would likely commit acts of dating violence against Rogers in the future is not so weak as to render the finding clearly wrong or manifestly unjust. The trial court's finding on this issue is supported by factually sufficient evidence. We overrule Kennell's second issue.

## CONCLUSION

Having overruled Kennell's issues, we affirm the protective order of the trial court.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   November 20, 2008

9